STATE OF MAINE *vs*. OLD TAVERN FARM, INC.

Cumberland.        Opinion, July 22, 1935.

*Walter M. Tapley, Jr.*, County Attorney for State.
*Robinson & Richardson*, for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, HUDSON, JJ.

THAXTER, HUDSON, JJ. Dissenting.

DUNN, J. A statute of this State, enacted in 1933, entitled: "An Act Requiring the Licensing of Operators of Milk Gathering Stations," declares that persons, firms, associations or corporations shall not engage or continue in the business of buying milk or cream within the State from producers, for sale, resale, manufacture or shipment to cities for consumption, without annually procuring licenses from the Commissioner of Agriculture, and posting bonds to that official in penalty not less than five hundred, nor more than one hundred thousand dollars, conditioned, among other things,

that the licensees will meet obligations arising from the purchase of such dairy products. Deposit with the Commissioner of money, or securities legalized for savings banks, would obviate giving bond. P. L. 1933, Chap. 210, Sec. 2, as amended by Chap. 283 (Special Session). The act exempts any "person" engaged in dairying who purchases not exceeding two hundred and fifty quarts daily "as a supplement to his own supply." The Commissioner may grant or decline a license, or revoke one already granted after due notice and a hearing, action being subject to review on certiorari.

The license fee is five dollars; violation of any provision of the act is punishable, upon conviction, as a misdemeanor.

The respondent, a domestic corporation, dealt, within State limits, in milk and cream, as a business, without having secured a license, and without having filed any surety bond. The agreed facts are not more specific in recital. If maintainable, the case shall be remanded for trial; otherwise, direction of dismissal.

The primary and important controversy is the constitutionality of the statute.

Counsel for respondent, in opposition to every presumption of validity, contends that, in exacting milk station operators, and no others, as a prerequisite to license, to file bonds or tangibly demonstrate pecuniary ability to pay producers, the enactment is unreasonably discriminatory, and constitutes an unwarranted interference with private rights.

The attorney for the State rejoins that the act is, as a police regulation, expedient and fairly suited to purpose in bona fide exercise of the discretion of the legislative department of government.

Statutes of this kind, to be sustained, must find a reason for their existence, in that inherent, original sovereignty called the police power of the state. *Boston & Maine R. R. Co.* v. *County Commissioners*, 79 Me., 386, 10 A., 113. Police power, in its broadest acceptation, means the general power of a government to preserve and promote the public health, safety, morals, comfort or welfare, even at the expense of private rights. Cooley, *Const. Lim.*, (6th ed.) p. 704. Speaking generally, police power is a power not granted in the Federal Constitution, but "reserved to the States respectively." *Const. of U. S.*, Art. X; *Keller* v. *United States*, 213

U. S., 138, 53 Law ed., 737; *House* v. *Mayes*, 219 U. S., 270, 281, 282, 55 Law ed., 213, 218. Such power should, however, observe its bounds; it cannot go beyond the State and Federal constitutions. *New Orleans Gas, etc., Company* v. *Louisiana Light, etc., Company*, 115 U. S., 650, 661, 29 Law ed., 516.

Health being the necessity of all personal enjoyment, and hence a special ward of the police power of the State, it is not only the right, but the duty, of the Legislature to pass such laws as may be reasonably necessary for the preservation of the public health. *Com.* v. *Waite*, 11 Allen, 264; *Johnson* v. *Simonton*, 43 Cal., 224.

Still, the Legislature cannot, under pretense of exercising the police power, enact a statute which does not concern the welfare of society. To illustrate, it is not enough that sanitation be merely incidental; it must have been intended to be effected. When, from perusal, there is no fair, just and reasonable connection between a statute and the common good, and it is manifest that such was not the object of the statute, it will not be sustained. *Austin* v. *Murray*, 16 Pick., 121, 126.

"What is called 'class legislation' would belong to this category, and would be obnoxious to the prohibitions of the Fourteenth Amendment." *Civil Rights Cases*, 109 U. S., 3, 24, 27 Law ed., 836, 843. It is true that this remark was made in regard to a different question than this case involves, but it applies here.

The Constitution of the State of Maine affirmatively secures to all persons an equality of right to pursue any lawful occupation under equal regulation and protection by law. Its words are these:

"All men are born equally free and independent, and have certain natural, inherent and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness." *Const. of Maine*, Art. 1, Sec. 1.

Pertinent provisions of the Fourteenth Amendment to the Constitution of the United States are:

". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Constitution of the United States is, within its province, through all times and events, as a governmental chart, supreme

throughout the Union. It invalidates all conflicting laws. *National Prohibition Cases*, 253 U. S., 350, 64 Law ed., 946. One of the greatest steps the Federal Constitution ever took was when Chief Justice Marshall gave distinct notice that it was the ultimate law against which nothing could prevail. *Marbury* v. *Madison*, 1 Cranch, 137, 2 Law ed., 60.

The civil "liberty" safeguarded is not merely freedom of the person from unjust or unlawful imprisonment. Liberty is freedom from all restraints except such as are justly imposed by law to secure the common welfare. The principle upon which liberty is based is equality under the law of the land. *Allgeyer* v. *Louisiana*, 165 U. S., 578, 589, 41 Law ed., 832; *Meyer* v. *Nebraska*, 262 U. S., 390, 67 Law ed., 1042.

The Fourteenth Amendment does not prevent reasonable classification as long as all within a class are treated alike. The liberty guaranteed is not freedom from all restraints, but from restrictions which are without reasonable relation to a proper purpose, and are unjustly arbitrary and discriminatory. *Miller* v. *Wilson*, 236 U. S., 373, 59 Law ed., 628. What is reasonable depends upon a variety of considerations. It is an elastic term of uncertain value in a definition. *Sussex Land, etc., Co.* v. *Midwest Refining Co.*, 294 Fed., 597.

The guaranties and assurances of the Constitution of Maine, and of the Constitution of the United States, are positive, direct, unchanged and unrelaxed by circumstances.

"Subject, however, to the limitation that the real object of the statute must appear, upon inspection, to have a reasonable connection with the welfare of the public, the exercise of the police power by the legislature is well established as not in conflict with the Constitution." *People* v. *Havnor*, 149 N. Y., 195.

The Fourteenth Amendment was not designed to interfere with due exercise of the police power by the State. *Barbier* v. *Connolly*, 113 U. S., 27, 28 Law. ed., 923.

In the case at bar, the defense is rested mainly on *State* v. *Latham*, 115 Me., 176, 98 A., 578.

That was a criminal proceeding against an individual. A statute (1915 Laws, Chap. 32,) undertook to lay down that certain purchasers of milk or cream should (except where a written contract

stipulated differently,) pay producers semi-monthly; and to prescribe a fine for non-observance.

The statute was of no legal force. It was held to afford milk producers, and no other creditors, the use of the criminal law in collecting mere civil obligations, and to contravene the Fourteenth Amendment.

The instant act is, in many respects, a literal copy of one in New York, there adjudged valid, first on the ground that, being severable, it was applicable, in view of power antecedently reserved to the Legislature of that State to amend, alter or repeal corporate charters, to corporations of local creation. *People* v. *Beakes Dairy Company,* 222 N. Y., 416, 119 N. E., 115. More recently, the law was held to apply to natural persons. *People* v. *Perretta,* 253 N. Y., 305, 171 N. E., 72.

There had been reserved to the Maine Legislature power to amend, alter or repeal corporate franchises, (R. S., Chap. 56, Sec. 2,) but its present enactment seems incapable, on first reading, of being separated or divided into component parts, so as to be incumbent by way of franchise alteration or amendment, on corporations, regardless of the inclusion of persons, firms and associations.

The language of Section 2, (Chap. 210, 1933 Laws,) so far as now material, is as follows:

"No person, firm, association or corporation, shall buy milk or cream within the state from producers for the purpose of sale or resale, or for manufacture, or for shipping the same into any city for consumption . . ." (unless annually licensed). "A license shall not be issued . . . , unless the applicant for such license shall file with the application a good and sufficient surety bond. . . . Such applicant may in lieu of such bond deposit . . . money or securities . . . , in an amount equal to the sum secured by the bond. . . ."

Use of the term "person" alone, would likely have been sufficient.

A corporation is a "person" within the meaning of constitutional clauses, and may invoke the benefit of civil rights and their guaranties. *Hammond Beef, etc., Co.* v. *Best,* 91 Me., 431, 40 A., 338.

In determining whether a statute "amends" or "alters" a corporate franchise, it is essential to ascertain the intent and object of the statute. On more careful examination, intent and object of the statute in judgment may be said to be, not the alteration or amend-

ment of the franchise of the respondent corporation, or franchises of that class of corporations to which it belongs, but subjugation to legislation which arbitrarily denies to them, and certain individuals, as well, what is accorded to others, in like case.

There is no food in more general use than milk; it is not only an important article of diet, but peculiarly liable to contamination and adulteration; if not properly supervised and cared for, it offers opportunity for the spread of disease.

The State, having authority to control foods, in intrastate aspects of the public health, may make rules on the subject. Statutes forbidding the sale of unwholesome articles of food and drink exist in many of the States. Our own statutes are expressly regulatory of the production and sale of milk. R. S., Chap. 42. Such legislation is within the police power. *State* v. *Smyth,* 14 R. I., 100.

The uniformity with which regulations of the kind have been upheld is shown in divers decisions, some being: *People* v. *Van de Carr,* 199 U. S., 552, 50 Law ed., 305; *Burmingham* v. *Goldstein,* 151 Ala., 473, 44 So., 113; *Koy* v. *Chicago,* 263 Ill., 222, 104 N. E., 1104; *State* v. *Schlenker,* 112 Iowa, 642, 84 N. W., 698; *Sanders* v. *Com.;* 117 Ky., 1, 77 S. W., 358; *State* v. *Broadbelt,* 89 Md., 565, 43 A., 771; *Com.* v. *Waite,* supra; *Com.* v. *Wheeler,* 205 Mass., 384, 91 N. E., 415; *Black* v. *Powell,* 248 Mich., 150, 226 N. W., 910; *State* v. *Campbell,* 64 N. H., 402, 13 A., 585; *State* v. *Smyth,* supra; *Norfolk* v. *Flynn,* 101 Va., 473, 44 S. E., 717; *Adams* v. *Milwaukee,* 144 Wis., 371, 129 N. W., 518, affirmed 228 U. S., 572, 57 Law ed., 971.

*Munn* v. *Illinois,* 94 U. S., 113, 24 Law ed., 77, and *German Alliance Insurance Company* v. *Lewis,* 233 U. S., 389, 58 Law ed., 1011, sustain the right of a State to control private business when clothed with a public use. These two cases, however, go only to fixing prices.

"All businesses are subject to some measure of public regulation, . . . that the business of . . . the dairyman may be subjected to appropriate regulation in the interest of public health, cannot be doubted." *New State Ice Company* v. *Liebmann,* 285 U. S., 262, 76 Law ed., 747.

*Nebbia* v. *People,* 291 U. S., 502, 78 Law ed., 940, holds that, as to prices of milk produced within the State, the industry may be

regulated, within reason, if the public interest demands.

Not price fixing, but the requirement of bond to pay the price, is now the test.

The proprietary plan of dealing in and with dairy products is much like any other business. The proprietor buys, is liable for purchases, and assumes risks and profits. There are, as is true of many concerns, some which result in failure. Injudicious locations, excessive capitalizations, have contributed, now and again, to brief careers. Mismanagement, fires, rivalry, add to the causes. Businesses come and go, and losses are inevitable. A business is without constitutional protection against the hazards of competition. *Hegeman Farms Corporation* v. *Baldwin*, 293 U. S., —, 79 Law ed, —.

Price security, counsel for the State contends, is vital to sanitary security. Producers, there is stress, needs must have assurance of pay, that they may be in situation to maintain sanitary conditions requisite to the purity of milk.

The rights of every person must stand or fall by the same rule of law that governs every other member of the body politic under similar circumstances, and every partial or private law which directly proposes to destroy or modify personal rights, or does the same thing by restricting the privileges of certain classes, and not of others, where there is no public necessity therefor, is unconstitutional and void. *State* v. *Goodwill*, 33 W. Va., 179, 25 A. S. R., 863.

What reasonable ground of discrimination, as pertains to public health or hygiene, is there between milk producers selling to gathering stations (who may be described as buying at wholesale,) and producers of perishable fruits and vegetables selling to wholesalers, and payment for what these producers sell? Such foods are liable to contamination, and are capable of transmitting infection. Why is the statute selective in its application? What, as a practical matter of cold fact, with respect to security for pay, is the real difference between the vendor supplying gathering stations, and any other vendor of milk? Why not equal rights among milk vendors? Why may milk producers sell to whom they will, except to gathering stations, without buyers having to put up bonds? Shall it not be lawful for the producer as seller, and the gathering

station as buyer, to sell and buy milk or cream, as other sellers and buyers are at liberty to do? Why, only, of purchasers, are those operating stations liable to punishment for not filing bonds or depositing money or securities?

The Legislature, to be sure, is not to be barred from classifying according to general considerations and prevailing conditions; it is not bound to extend regulation as far as it might be made to reach; but why the distinction as to operators of milk gathering stations? What evil was specially experienced in the general nature of that particular branch of business? What differences were recognized to exist? The answer is not evident in the statute.

Looking through form to substance, *State* v. *Latham,* cited before, decided that the exaction of semi-monthly payments for milk and cream, but not for any other product bought of a producer, lacked valid reason for differentiation, determined without method, was not reasonable as to classes and conditions, and infringed fundamental rights which organic laws protect.

The legislation was denominated class legislation, transgressing permissible discretion, in violation of the Fourteenth Amendment. The equality clause was selected for special comment. The opinion is based on the doctrine of liberty of personal contract. *State* v. *Latham,* supra.

The Latham Case is of controlling analogy.

Without attempting to define the limits of the power of the Legislature of Maine to control the right to make contracts, conclusion reached is that it had no right to require, as a condition precedent to obtaining a license, that a gathering station proprietor give bond, or deposit money or securities, to secure the payment of them from whom he might buy milk and cream. The legislation is not within the scope of the police power; it trenches upon the State and Federal constitutions. *State* v. *Latham,* supra; *Const. of Maine,* supra; *Const. of U. S.* (Fourteenth Amendment), supra.

The complaint should be dismissed.

*So ordered.*

## DISSENTING OPINION.

HUDSON, J. The statute in question makes as a condition precedent to the issue of a license to a milk gatherer that he deposit money or securities or file a good and sufficient surety bond conditioned for faithful compliance with its provisions and particularly "for the payment of all amounts due to persons who have sold milk or cream to such licensee, during the period that the license is in force." It is claimed that this law is unconstitutional because of the optional deposit or filing of the bond. As I read the opinion, it holds as an abstract principle of law that the incorporation of this condition renders the law unconstitutional.

It states:

"Without attempting to define the limits of the power of the legislature of Maine to control the right to make contracts, conclusion reached is that it had no right to require, as a condition precedent to obtaining a license, that a gathering station proprietor give bond, or deposit money or securities, to secure the payment of them from whom he might buy milk and cream. The legislation is not within the scope of the police power; it trenches upon the State and Federal Constitutions."

If unconstitutional, it is because it is not within the proper exercise of the police power.

"The police power has been defined to be devoted to the protection of the lives, health and property of citizens and the maintenance of good order. . . . *Patterson* v. *Kentucky*, 97 U. S., 501; *Barbier* v. *Connolly*, 113 U. S., 27." *Bierly Police Power*, page 9.

"With the Legislature, the maxim of the law, 'salus Populi Suprema lex' should not be disregarded. It is the great principle on which the statutes for the security of the people is based. It is the foundation of criminal law, in all governments of civilized countries, and other laws conducive to safety and consequent happiness of the people. This power has always been exercised by government, and its existence can not be rea-

sonably denied. How far the provisions of the legislature can extend, is always submitted to its discretion, provided its Acts do not go beyond the great principle of securing the public safety—and its duty, to provide for this public safety, within well defined limits and with discretion, is imperative." *State* v. *Noyes*, 47 Me., 189, 211, 212.

In *Boston Maine Railroad Company* v. *County Commissioners*, 79 Me., 386, our Court held a statute constitutional which placed upon railroads the burden of bearing the expense of building and maintaining so much of a town way or highway as was within the limits of the railroad where such way crossed the track at grade. Justice Emery said:

"This power of the Legislature to impose uncompensated duties and even burdens, upon individuals and corporations for the general safety, is fundamental. It is the 'police power.' Its proper exercise is the highest duty of government. . . . This duty, and consequent power, override all statute or contract exemptions. . . . All personal as well as property rights must be held subject to the police power of the State. . . . Its exercise must become wider, more varied and frequent, with the progress of society. . . . The case *State* v. *Noyes*, 47 Me., 189, decided in 1859, is now generally considered too narrow and strict an interpretation. Broader views have prevailed since then."

Later, in *State* v. *Starkey*, 112 Me., 8, 12, this:

"The police power of the State is co-extensive with self-protection, and is not inaptly termed 'the law of overruling necessity.' It is that inherent and plenary power in the State which enables it to prohibit all things hurtful to the comfort, safety and welfare of society."

In *State v. Robb*, 100 Me., 180, Justice Savage with approval quoted Chief Justice Shaw in *Commonwealth* v. *Alger*, 7 Cush., 83, at page 85, as follows:

"The power we allude to is rather the police power, the power vested in the Legislature by the Constitution to make,

ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same."

And on page 85 Justice Savage said:

"And all persons exist, and all property is held subject to that power and right. . . . All property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community. . . . The constitutional guaranties that no person shall be deprived of life, liberty or property, without due process of law, and that no State shall deny to any person within its jurisdiction the equal protection of the laws were not intended to limit the subjects upon which the police power of a state may lawfully be exerted. *Minneapolis Railway Co.* v. *Beckwith,* 129 U. S., 26; *Jones* v. *Brim,* 165 U. S., 180."

Later, in *State of Maine* v. *Latham,* 115 Me., 176, on page 177, Chief Justice Savage stated:

"That the Fourteenth Amendment was not designed to interfere with the proper exercise of the police power by the State . . . And the doctrine has been reaffirmed since in many cases, both in the Federal and in the States courts. It is settled doctrine. *State* v. *Montgomery,* 94 Me., 192; *State* v. *Mitchell,* 97 Me., 66; *State* v. *Leavitt,* 105 Me., 76."

In *Guilford Water Company,* 118 Me., 367, on page 371 Justice Dunn quoted with approval the following from *Atlantic Coast Line Railroad Company* v. *Goldsboro,* 232 U. S., 548:

"Neither the 'contract clause' nor the 'due process' clause has the effect of overriding the power of the state to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; . . . and that all contract and property rights are held subject to its fair exercise."

The opinion in the instant case neither expressly nor impliedly denies that the Legislature has the right to compel a milk gatherer to obtain a license. It is assumed. Many times has our Legislature under the police power, as have legislatures in most of the states, legislated to control and regulate the milk industry.

The question, then, is whether or not the compelled performance of this condition in this statute as a prerequisite to the issue of the license extends beyond legislative right in the exercise of the police power. The Chief Justice and my associates, save one, give an affirmative answer in the form of a declaration of abstract law. To my mind, this case is not one that may yield to such abstractness.

Whether a statute is within or without the police power must depend upon the facts attending its enactment. This case comes to us on an agreed statement of facts and unfortunately the statement is so brief and so incomplete (containing hardly more than the language of the statute without preamble) that we do not have any facts even tending to show the reason for its enactment, whether to satisfy a public exigency or to serve only the milk producer.

Except for a copy of the complaint and a statement that the respondent was found guilty and fined, from which judgment he appealed, the only facts reported are these:

"At the time the complaint was made the defendant corporation was engaged in the business of dealing in milk and cream in Portland and vicinity; had not secured a license from the Department of Agriculture of the State of Maine, and had not filed any surety bond with the Commissioner of Agriculture of the State of Maine."

Thus we have no way of determining, except as we conjecture, (and we have no right to indulge ourselves in that realm) as to what induced the Legislature to enact this law. It goes without saying that with the presence of certain facts and to accomplish certain purposes a law may be constitutionally enacted within the exercise of the police power when not under other circumstances and for other purposes. True, if this Legislature passed this law solely in the interest of the milk producer and to give him a right

over other creditors in other businesses to have a special means of collection (even to the extent of the employment of the criminal law), it would not be in the interests of the public and could not be upheld under the police power. But what right have we to say that that was the object of the Legislature in passing this law rather than to aid the milk consuming public by making it more certain that the farmer by being paid would be enabled to produce the necessary supply.

> "Where two courses are open and one interpretation upholds the law as constitutional and the other defeats it, the courts must adopt the one that preserves the law's validity." *Seward* v. *State ex rel Kratt*, 195 N. E., 241, 242 (Ohio).

The law is presumed to be constitutional. Presumably facts produced before the Legislature presented a situation (and where it does not otherwise appear we must assume that there was such a situation presented) that permitted the enactment of this law within the police power. As against the presumption of constitutionality, with no facts before us evidencing the contrary, we have no right to say that this law was not passed to satisfy a public need and for its common welfare. We must assume that the Legislature adjudged that by this law as written a needed supply of milk was the better guaranteed. The presumption is that the Legislature acted within its right and that to it there was presentation of facts justifying such a law in the interests of the public. Our judgment on the exigency should not supplant that of the Legislature and can not where they had the facts and we do not.

> "Every rational presumption is indulged in favor of the validity of an act of the General Court. Enforcement of such legislative enactment will not be refused unless its conflict with some provision of the Constitution is established beyond reasonable doubt." Chief Justice Rugg in *Commonwealth* v. *City of Boston*, 195 N. E., 802, 803.
> "In approaching this decision it must be borne in mind that a conflict between a statute and the constitution must be plain and unmistakable to warrant the Court in declaring an act unconstitutional. Every presumption is in favor of the valid-

ity of a legislative enactment. If a reasonable doubt exists, the statute should be upheld. . . . So long as a statute does not infringe any provision of the Constitution, the Court is not concerned with its wisdom, desirability, or necessity. The framers of our government saw fit to give all legislative power to the legislature. That body is primarily the judge of the regulations required by the public need. . . . The Courts must turn a deaf ear to complaints against legislation, unless it is forbidden by the fundamental law of the land." *People* v. *Ryan*, 243 N. Y. S., 644, 647, 648.

"To justify the Court . . . in declaring the statute invalid, the conflict between the act and the constitution must be clear and certain. Every presumption favors the validity of the statute. If there is a reasonable doubt, the act should be upheld. A case must be presented in which there can be no rational doubt." *In re Hauges*, 252 N. Y. S., 81, 88.

The facts and the necessities of the public determine the valid or invalid employment of the police power.

"The validity of police regulations must depend on the circumstances of each case and the character of the regulation, whether arbitrary or reasonable." *People* v. *Ryan*, supra, on page 649.

There being no evidence to rebut the presumption of validity, we should honor it and declare that on this record this statute is not to be held unconstitutional.

"Courts ought not to pronounce any act of the legislature unconstitutional unless it is plainly so—so plain as to leave no doubt on the subject. To doubt is to affirm its constitutionality. There is no such thing as a doubtful constitutional statute. Every presumption is in the favor, and there is no stronger presumption known to law. . . . All constitutional restraint must be read in the light of the police power of the state. On proper occasions this power may rise superior to both state and federal Constitutions, for in its exercise, when occasion demands, lies the right of the state to preserve its

very existence. . . . Then, too, another general principle applicable here is that a state Legislature deals with situations from a practical standpoint. It is better qualified than the court to determine the necessity, character, and degree of regulation of an industry, which new and perplexing conditions may require; and its conclusions should not be disturbed by the courts unless they are clearly arbitrary and unreasonable." *Reynolds* v. *Milk Commission of Virginia,* 179 S. E., 507, 510.

Should we judicially notice facts, if such exist, that would tend to show there was no such exigency as would warrant this exercise of the police power? Many facts may be judicially known; but "matters of uncertainty and theory, though they concern the public health" may not be so noticed. 15 R. C. L., Sec. 58, on page 1132. Facts that we might now judicially notice may have been considered by the Legislature in connection with other facts proven to it, and yet from the consideration of all such facts the Legislature determined that there was such an exigency as warranted the exercise of the police power. Disputed facts are not properly the subject of judicial notice. The Legislature's conclusion as to the exigency should now obtain, unless palpably erroneous and the law unconstitutional beyond a reasonable doubt. We should not thwart the will of the Legislature and nullify its action, without evidence of the facts which induced its enactment of this law, if and simply because we may believe that conditions do not exist that reasonably necessitate such a statute. We should not usurp legislative power though indirectly by decision but leave with this coordinate branch of the government its full and unrestricted right as representatives of the people to pass laws, when not unconstitutional beyond a reasonable doubt. Unless clearly wrong according to law applied to facts in the record and those of which we have the right to take judicial notice, this statute should be declared constitutional.

"We must determine the question" (involving the validity of a statute under the police power) "with reference to those facts which are so well and universally known that courts will take notice of them without particular proof being adduced in

regard to them, and also by reference to those dealings of the commercial world which are of like notoriety." *Schollenberger* v. *Pennsylvania,* 171 U. S., 1, 8.

"Whether it is or not" (wholesome to put boric acid in food) "is a matter of dispute. In such cases, in enacting legislation in the exercise of the police power of the state, the legislative declaration that it is unwholesome must be accepted by the courts, and they will not investigate the facts for the purpose of determining whether the declaration of the Legislature was warranted by the facts. . . . The same principle has been declared by this court in cases involving the right of a legislative body, state or municipal, to declare a thing a nuisance." *People* v. *Price,* 101 N. E., 196, 198, 257 Ill., 587.

"While, in its last analysis, it is a judicial question whether an act is an exercise of the police power, it is the province of the Legislature to determine when an exigency exists calling for the exercise of this power. When the legislative authority has decided an exigency exists calling for the exercise of the power, and has adopted an act to meet the exigency, the presumption is that it is a valid enactment, and courts will sustain it unless it appears, beyond any reasonable doubt, that it is in violation of some constitutional limitation . . . In determining the validity of legislation for the purpose for which the act under consideration was adopted, courts may take into consideration that members of the Legislature come from every part of the state and from the various callings and vocations of life, and may be presumed to have observed and become acquainted with existing conditions, the course of business, or manner in which it is conducted, and how the public interest is affected thereby. . . . These considerations, in a case of doubtful validity of a statute, are sufficient to turn the scales in favor of the validity of the act, . . . There is nothing in the record in this case and nothing within the legitimate domain of judicial knowledge that would justify us in holding there is no reasonable connection between the limitation and the health, welfare, and safety of the public." *People* v. *Elerding,* 40 L. R. A. Ann. (N. S.), 893, 896, 897.

The right to license the milk gatherer (and this is not denied) implies a right to refuse when lawfully it should not be granted.

"Subject to such limitations as the legislature, within constitutional limits, may deem proper to impose, power to license . . . includes: The power of determining the extent to which it is advisable and necessary to exercise such power; . . . The power given to a municipality to license and regulate an occupation or privilege imposes no obligation on it to grant any licenses; but includes the power to refuse a license in a particular case, even where the statutory or preliminary requirements are complied with." 37 C. J., Secs. 22 and 28 on pages 180, 181 and 183; *Burgess* v. *Brockton*, 235 Mass., 95; *Rea* v. *Everett*, 217 Mass., 427.

In the latter case, on page 431, Chief Justice Rugg said:

"If upon an impartial investigation of the applicants for permits, undertaken with a purpose to comply with the law, the respondent should be of opinion that no one of the applicants was regularly and lawfully conducting a general express business or was of such character that he could not be trusted to comply or honestly to attempt to comply with the terms of the statute, they would not be required to issue a permit."

Were it shown that the prospective licensee on account of previous fraudulent practices were one who should not receive a license, its denial would and should be upheld in the interests of the public. Likewise, if it appeared that a milk gatherer were one about to engage in so large a volume of business that it could be known with reasonable certainty that he would contract debts which he could not pay, a license to him would rightly be denied, else the State would knowingly make itself a party to the possibility if not probability of transactions whereby its people would be deprived of their property without payment. A license by the State may be construed as an act of approval of the licensee as one somewhat worthy of respect and possessed of necessary qualifications, including honesty, for carrying on his permitted business.

"The Legislature has a wide discretion in protecting the public from the dishonest and irresponsible." *People* v. *Ryan*, 243 N. Y. S., 644, 649, 650.

If the license may be refused to him altogether, why should not the Legislature have the right to do the lesser thing — issue the license qualifiedly upon the making of the deposit or the filing of the bond? Under the instant statute, the milk gatherer, if he can obtain the bond required, will be aided, for although financially unable from his own means to finance the business, he may receive the license. Thus this law makes a concession to him.

True, this is an interference with the right to conduct private business. So is the necessity of the license. Every exercise of police power no doubt affects the right of private contract. Choice must be made between the right of the individual and the right of the public at large. When the facts necessitating the legislation are so compelling in the interest of the public, the individual must yield.

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference but neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. . . . Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government. Touching the matters committed to it by the Constitution, the United States possesses the power, as do the states in their sovereign capacity touching all subjects jurisdiction of which is not surrendered to the federal government, as shown by the quotations above given. These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined

which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need. . . . And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts." *Nebbia* v. *New York*, 291 U. S., pages 523, 524 and 525.

The police power is "not the offspring of constitutions. It is older than any written constitution. It is the power which the states have not surrendered to the nation, and which by the Tenth Amendment were expressly reserved 'to the states respectively or to the people.' Limitations expressed or necessarily implied in the Federal Constitution are the frontiers which the Police Power cannot pass. Within those frontiers its authority is recognized and respected by the constitution and given effect by all courts. We have seen that private property is held subject to the implied condition that it shall not be used for any purpose that injures or impairs the public health, morals, safety, order or welfare. Under the police power statutes and authorized ordinances give this condition practical effect by restrictions which regulate or prohibit such uses." *York Harbor Village Corporation* v. *Libby et al.*, 126 Me., 537, 540.

"The two considerations involved in all of these statutes are the right of a man to run his private business as he pleases, on the one side, and the protection of society against irresponsible individuals or companies, on the other. The courts which hold all of the above mentioned statutes unconstitutional and value the independent right to do business without

restriction as a supreme right are in the minority. The modern tendency is to safeguard the public against being defrauded." Note on *People* v. *Perretta*, 253 N. Y., 305, 171 N. E., 72, in the *St. Louis Law Review*, Vol. 16, No. 2, page 170, February, 1931.

*State* v. *Latham*, 115 Me., 176, is relied upon by the defence. In that case the Court held a statute unconstitutional that provided that the buyer of milk or cream should pay the seller semi-monthly unless other provision were made by written contract between the parties. In that case the Court found as a fact (and it does not appear that the Court did not have before it a complete record of the facts) that the statute was "designed to compel purchasers of a particular product, intended for a particular use, to pay their purchase debts at particular times on pain of criminal prosecution, punishment by fine, and, of course, imprisonment for thirty days, if the fine is not paid." It does not hold that there could not be facts that would justify constitutionally such a provision, facts sufficiently showing the necessity of such legislation in the interests of the public. Chief Justice Savage, on pages 177 and 178 said:

"Whether such a statute, designed to aid in the collection of mere civil obligations by the use of the strong arm of the criminal law is within the proper exercise of the police power is at least questionable. Certainly it is not unless the regulation intended be for the promotion of the public health, safety, morals, comfort or welfare."

If the public need of such a law be urgent (as if, for instance, the welfare of a congested urban population demands the assurance of a supply of this commodity which otherwise it would not receive —and this is for the judgment of the legislature), then such legislation may be enacted under the police power, in my judgment, and the exercise of it will not offend the Fourteenth Amendment so long as it is not arbitrary or discriminatory legislation.

In *York Harbor Village Corporation* v. *Libby*, supra, on page 542, Justice Deasy said:

"The defendants also contend that they have been denied the 'equal protection of the laws' guaranteed by the Fourteenth Amendment. The statute is, they urge, discriminatory but discriminatory statutes are not, for that reason, invalid. In the enactment of many statutes, classification of persons is proper, legal and indeed necessary. . . . A classification must not be arbitrary. It must be natural and reasonable. . . . It must be based upon an actual difference in the classes bearing some substantial relation to the public purpose sought to be accomplished by the discrimination in rights and burdens. . . . If a classification, though necessarily discriminatory, stands these tests, it is not a denial of equal protection of the laws."

So tested, this provision is neither arbitrary nor discriminatory in the proper legal sense of being unnatural and unreasonable. The fact that other creditors than producers of milk, as sellers of fuel or perishable goods, are not compelled to take out licenses and perform the condition does not necessarily prove illegal discrimination, for paraphrasing Justice Deasy's language, it can be said there may well be found to be such natural differences (as hereinafter noted) bearing upon some substantial relation to the public purpose sought to be accomplished as to make it non-arbitrary and undiscriminatory. In the judgment of the Legislature, it may well be that under one set of circumstances with relation to a certain industry or trade it is perfectly natural and reasonable that a creditor selling to such an industry or trade be so protected, while under other circumstances with relation to an entirely different industry or trade it will not.

It has been well said in *Nebbia* v. *New York*, 291 U. S., 502, that,

". . . milk is an essential item of diet. It can not long be stored. It is an excellent medium for growth of bacteria. These facts necessitate safeguards in its production and handling for human consumption which greatly increase the cost of the business. Failure of producers to receive a reasonable return for their labor and investment over an extended period threaten a relaxation of vigilance against contamination. The production and distribution of milk is a paramount industry of

the state, and largely affects the health and prosperity of its people. . . . The fluid milk industry is affected by factors of instability peculiar to itself which call for special methods of control." (See pages 516 and 517.)

The leading case upholding the constitutionality of such a bond provision I believe to be *People* v. *Perretta,* supra. In that case the bond was imperative, conditioned for the prompt payment of all amounts due producers of milk. Our statute bears very close resemblance to the New York statute. First the law was held unconstitutional (See 236 N. Y. S., 293), but on appeal the decision was reversed in 253 N. Y., 305, 171 N. E., 72. It is to be noted that in that case there was no time limit on the legislation as there was in *Nebbia* v. *N. Y.,* supra, and thus it was decided free from the argument of emergency. Justice Pound in his opinion quoted with approval from the Beakes case in 166 N. Y. S., 209, 210, as follows:

"It is vital to the public welfare that the cities of the state be supplied with pure and wholesome milk. It is of the utmost importance to the public welfare that the farmers should be induced to produce milk for use in the cities, and that the persons purchasing and shipping milk for city use shall be responsible persons, so that the seller shall receive pay for his milk. It is a fact too well known to need discussion that the farming community has suffered great damage by irresponsible persons buying on credit their milk for shipment to the large cities without paying therefor. Such transactions naturally tend to convince the farmer that it is better for him to limit his production of milk, or take it to the home factory to be manufactured there, dealing with people whom he knows, rather than to sell it for city use. It is apparently recognized as impracticable that the payments should be made to the farmer upon the delivery of each sale of milk. When a person seeks to buy milk from the farmers of the state to ship to the cities of the state for use and consumption, his transactions affect the public interest, and the welfare of the farming community means the welfare of the public, and the state may

properly protect the farmer from irresponsible dealers, who seek his milk for shipping to the cities. This law, as we have indicated, has more than one aspect. It naturally benefits the farmers, but it guarantees the city a supply of milk. . . .

"The producer of milk for the city market desires to find a ready purchaser near at hand to take his product from the source of supply to the point of consumption. He can not peddle his product from door to door, or hold it to await a rise in market prices or a cash purchaser. He must sell it to milk gatherers; deliver it fresh, and often on credit. Such are the conditions of the market peculiar to the handling of milk. The law deals with a definite class, i.e., the milk gatherers. It is not wholly for the benefit of the farmer."

In concluding his opinion, Justice Pound further said:

"When the Legislature has power to act, it may act without interference from the courts. The Legislature has, we find, acted on reasonable grounds and in a reasonable manner."

It is of interest to note that in *People* v. *Perretta,* supra, Justice Pound said this of *State* v. *Latham,* supra:

"If it gives him 'a club to aid in the collection of debts which is not given to other creditors' it gives it to him to keep open the stream of milk flowing from farm to city as well as to guard him from financial loss."

The New York Court likewise, including reference to *State* v. *Latham,* supra, stated that "the reasoning in these cases rests on the abstract doctrine of liberty of contract rather than the practical necessities of the case." The words, "these cases" refer only to two other cases besides *State* v. *Latham,* namely *State* v. *Porter,* 94 Conn., 639, and *State* v. *Levitan,* 190 Wis., 646.

The great weight of authority is to the contrary and in accord with *State* v. *Perretta,* supra. It is of interest, as well as informing, to note the comments of the leading Law School Journals on *State* v. *Perretta* and therein may be found collated many cases which either directly or by analogy uphold the constitutionality of such a bond provision.

The *Columbia Law Review*, in its issue of November, 1929, Vol. XXIX, page 1012, before the constitutionality of the New York statute was upheld on appeal, stated:

"In any event, it is not so clearly unreasonable as to warrant overriding the judgment of the Legislature by holding it unconstitutional."

In February, 1931, the *Minnesota Law Review*, Vol. 15, No. 3, said:

"It would seem that in view of comparative evils in other situations in which it has been held that similar regulations were justified under the police power, the decision in the instant case was correct."

In March, 1931, the *Michigan Law Review*, Vol. XXIX, page 629, stated:

"It seems that the validity of the statute is correctly sustained if we can agree with the Court on the fact decision that the Legislature reasonably determined that the law was necessary."

Also in February, 1931, the *St. Louis Law Review*, Vol. XVI, No. 2, stated:

"The courts which hold all of the above-mentioned statutes unconstitutional and value the independent right to do business without restriction as a supreme right are in the minority. The modern tendency is to safeguard the public against being defrauded."

No note on *State* v. *Perratta* has been written as yet in the *Harvard Law Review* but *People* v. *Nebbia*, supra, and herein later referred to and dealt with, has been commented upon in this Review, prior, however, to the final decision of said case by the United States Supreme Court. It will be recalled that in the lower court that statute was declared constitutional, which decision was affirmed by the United States Supreme Court. Referring to the decicision in the lower court, the *Harvard Law Review* of November, 1933, Vol. XLVII, No. 1 on page 130, said:

"Even if, as the dissenting Judge believed, relief of the producers was the essential object of the Act, the amelioration of a minority group may be a proper exercise of the police power."

It should be born in mind that the decision of our Court in *State* v. *Latham,* supra, was rendered nineteen years ago.

It may be said, as was said, by quotation, in *People* v. *Bratowdky,* 276 N. Y. S. on page 425.

"Doubtless the statute before us would be condemned by an earlier generation as a temerarious interference with the rights of property and contract; . . . with the natural law of supply and demand. But we must not fail to consider that the police power is the least limitable of the powers of government and that it extends to all the great public needs; that constitutional law is a progressive science; that statutes aiming to establish a standard of social justice, to conform the law to the accepted standards of the community, to stimulate the production of a vital food product by fixing living standards of prices for the producer, are to be interpreted with that degree of liberality which is essential to the attainment of the end in view . . . ; and that mere novelty is no objection to legislation. . . ."

Quite akin, if not controlling, is the law enunciated in *Nebbia* v. *New York,* 291 U. S., 502, decided March 5, 1935, in which it was held that a statute fixing the minimum prices for the sale of milk was constitutional. Much said in that opinion has pertinency here. From pages 522 and 523 the following:

"Proprietors of milk gathering stations or processing plants are subject to regulation, (Sec. 54), and persons in charge must operate under license and give bond to comply with the law and regulations; must keep records, pay promptly for milk purchased, abstain from false or misleading statements and from combinations to fix prices. . . . In addition there is a large volume of legislation intended to promote cleanliness and fair trade practices, affecting all who are en-

gaged in the industry. *The challenged amendment of* 1933 *carried regulation much farther than the prior enactments."*

Thus, although the United States Supreme Court has stated that a law fixing prices goes much farther than a regulatory law providing for a bond, it held the price fixing law constitutional. A fortiori, one would believe, the same Court would hold this statute providing for the bond constitutional, did facts attend the case, showing the necessity for such legislation for the public welfare.

Justice Roberts further stated in the Nebbia case, on page 537:

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to . have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio. . . . And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. . . . Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power. . . . If the law-making body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the

supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the legislature to be fair to those engaged in the industry and to the consuming public. . . . The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." *Nebbia* v. *New York*, 291 U. S., 502, 537, 538, 539.

It may be urged that the statute in the Nebbia case had a time limit of one year as the period for price fixing and so the decision rests upon the fact of emergency as justification for the exercise of the police power, but it is to be observed that Justice Roberts made no reference whatever to the fact of the time limit as a reason for the decision.

In connection with the argument of emergency and its effect on the constitutionality of the legislation, we give the language of Chief Justice Hughes in the recent cases of *Schechter Poultry Corporation et al.* v. *United States of America* and the *United States of America* v. *Schechter Poultry Corporation et als.*, decided May 27, 1935, 55 Sup. Ct. Rep., 837.

"We are told that the provision of the statute authorizing the adoption of codes must be viewed in the light of the grave national crisis with which Congress was confronted. Undoubtedly, the conditions to which power is addressed are always to be considered when the exercise of power is challenged. Extraordinary conditions may call for extraordinary remedies. But the argument necessarily stops short of an attempt to justify action which lies outside the sphere of constitutional authority. Extraordinary conditions do not create or enlarge constitutional power."

From this it would seem to follow that, if in the Nebbia case there was an emergency, that fact alone did not save the constitutionality of the statute and, to paraphrase Chief Justice Hughes' language, it may be said that the extraordinary condition of an emergency did not create or enlarge constitutionally the police power.

The opinion in the instant case in stating "that these two cases, however, go only to fixing prices" and later that "not price fixing; but the requirement of bond to pay the price, is now the test" gives the impression that our Court regards it necessary that there be more compelling evidence for the exercise of the police power to permit the giving of a bond than the fixing of prices. As I understant the decision in the Nebbia case, that is directly contrary to Justice Roberts' statement that price fixing goes "much farther than the prior enactments" which included a statutory enactment requiring the giving of such a bond by a milk gatherer to the milk producer.

If the decision in the Nebbia case rests upon the ground, as I understand it does, that the statute therein considered was in the interest of and for the common welfare of the public in making it possible for the producer to receive enough for his milk so that he might produce the necessary supply for the public, then why does it not follow that this statute providing for the making of a deposit or the giving of a bond to accomplish the same result is likewise constitutional as a proper exercise of the police power? So far as the milk gatherer himself is concerned, no doubt it is a less objectionable provision than that of a statute by which the state so dominates his business as to fix and regulate prices.

In conclusion, it is my judgment that the burden resting on the respondent to prove the unconstitutionality of this statute has not been sustained and that the entry should be, as stipulated in the Report,

"The Case to Stand for Trial."

THAXTER, J.   I concur in this opinion.