THE STATE OF CONNECTICUT vs. GRANT PORTER.

Third Judicial District, Bridgeport, April Term, 1920.
PRENTICE, C. J., WHEELER, BEACH, GAGER and CASE, Js.

Chapter 194 of the Public Acts of 1919 prohibits everyone, under
   penalty of fine or imprisonment, or both, from engaging in the
   purchase of milk or cream from producing dairymen, to be resold
   either to dealers or at retail to consumers, without having obtained
   from the dairy and food commissioner a license therefor; and
   provides that each applicant for a license shall either furnish proof
   of his financial responsibility to meet his obligations contracted in
   the purchase of such milk or cream, or give a bond to the State,

satisfactory to the commissioner, conditioned upon the faithful fulfilment of such obligations, the avails of which bond, collected upon suit by the Attorney-General, shall be used by the commissioner in satisfaction, pro rata, of the claims of producing dairymen against such licensee and obligor. Upon demurrer to an information charging a violation of the Act, it was *held*:—

1. That the statute in prohibiting the conduct of a business which upon its face was one in which all citizens had an equal right to engage, and in attempting to regulate it not in the interest of public health and safety, but for the financial protection of a small class of the community, violated the principle of equality of right expressly embodied in the first article of the Constitution of this State, and was therefore unconstitutional.

2. That § 2 of the Act, which sought to confer judicial powers upon the dairy commissioner in the matter of hearing and passing upon claims against a defaulting licensee, without providing for an appeal to any court, and empowered the commissioner to turn over the licensee's property to his alleged creditors without giving him any opportunity for a judicial hearing,—was manifestly unconstitutional for these reasons.

The justification for legislative interference in the conduct of a lawful business, or that which appears upon its face to be such, is the preservation of the public health, safety, or welfare.

While every intendment is to be made in favor of the validity of legislative enactments, they are nevertheless subject to investigation in the courts with a view to determining whether the statute or ordinance is a lawful exercise of the police power, or whether, under the guise of enforcing police regulations, there has been an unwarranted and arbitrary interference with constitutional rights to carry on a lawful business, to make contracts, or to use and enjoy property.

Argued April 13th—decided May 7th, 1920.

INFORMATION for engaging in the purchase from producing dairymen of milk to be resold at retail to consumers, without having obtained a license therefor from the dairy and food commissioner, in alleged violation of Chapter 194 of the Public Acts of 1919, brought to and tried by the District Court of Waterbury upon a demurrer to the complaint; the court, *Makepeace, Deputy-Judge*, sustained the demurrer and rendered judgment for the accused, from which the State appealed. *No error.*

*Arthur F. Ells,* for the appellant (the State).

*Charles G. Root,* for the appellee (the accused).

BEACH, J. This information was brought under Chapter 194 of the Public Acts of 1919, the first section of which provides that no person shall engage in the purchase from producing dairymen of milk or cream to be resold, either to dealers or at retail to consumers, without having obtained from the dairy and food commissioner a license to be issued by him under the provisions of this Act. All licenses are to run to the first day of July following the date of issue, and to be revocable by the commissioner for cause and after notice, with a provision for appeal to the Court of Common Pleas or the Superior Court in Hartford County, and the license fee is fixed at the rate of fifty cents a month. Section 2 of the Act is as follows:—

"Sec. 2. Each applicant shall furnish to the commissioner proof of his financial responsibility to meet such obligations as he may contract in the purchase of such milk and cream, or he shall furnish a bond, sufficient in amount and satisfactory to the commissioner, running to the State, to be filed with the commissioner, conditioned upon the faithful fulfilment of his obligations to producing dairymen for milk and cream purchased by him in the conduct of such business. Suit for forfeiture of such bond may be brought by the attorney-general in the name of the State in the Court of Common Pleas or the Superior Court for Hartford County, and the avails thereof shall be used by the dairy and food commissioner to satisfy, pro rata, the claims of producing dairymen against such licensee. Claims may be proved at a hearing before the dairy and food commissioner, or his deputy, provided notice of such hearing shall have been given to all known

The State *v*. Porter.

parties in interest at least fifteen days prior to such hearing, and by newspaper publication."

Section 3 requires the licensee, on request, to file with the commissioner a statement under oath showing the amount of milk and cream purchased by him during the preceding month, and provides that the commissioner may order an increase or decrease in the amount of the existing bond.

Section 4 provides for a penalty of fine and imprisonment for violation of the Act.

The demurrer to the information is based on the claim that the statute is unconstitutional. It is of course admitted that the State may require milk dealers to take out a license and may charge a license fee proportionate to the cost of supervising the business. But it is claimed that the requirements and conditions of §§ 2 and 3 are unconstitutional. The general principles applicable in the consideration of the constitutionality of statutes which interfere in the conduct of what appears to be a lawful business, are well settled. The justification for such interference is the preservation of the public health, safety or welfare. Every intendment is to be made in favor of the lawfulness of such regulations, and it is not the province of the court to interfere except in clear cases. Nevertheless such regulations "are subject to investigation in the courts with a view to determining whether the law or ordinance is a lawful exercise of the police power, or whether under the guise of enforcing police regulations there has been an unwarranted and arbitrary interference with the constitutional rights to carry on a lawful business, to make contracts, or to use and enjoy property." *Dobbins* v. *Los Angeles*, 195 U. S. 223, 236, 25 Sup. Ct. 18. "To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from

those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." *Lawton* v. *Steele,* 152 U. S. 133, 137, 14 Sup. Ct. 499. "If there existed a condition of affairs concerning which the legislature of the State, exercising its conceded right to enact laws for the protection of the health, safety or welfare of the people, might pass the law, it must be sustained; if such action was arbitrary interference with the right to contract or carry on business, and having no just relation to the protection of the public within the scope of legislative power, the Act must fail." *McLean* v. *Arkansas,* 211 U. S. 539, 548, 29 Sup. Ct. 206. Quoted with approval in *Adams* v. *Tanner,* 244 U. S. 590, 37 Sup. Ct. 662.

In *State* v. *Conlon,* 65 Conn. 478, 33 Atl. 519, the subject of constitutional limitations of the exercise of the police power was under consideration. In that case we pointed out that the principle of equality in rights was embodied in the general and comprehensive language of our Bill of Rights; and held that in the case of an ordinary lawful business essential to the conduct of human affairs, the legislature had no right to restrict the issuance of licenses to engage in such business to such persons as might be found to be "proper persons" by the municipal officers of cities, boroughs and towns. Speaking of such a business we said: "The legislature has full power to regulate such a business, but its regulations must be governed by very different principles from those which may govern the regulations of a business in its nature dangerous to the public. In the one business no citizen has an absolute right to engage; in the other all citizens have the right and an equal right to engage. The difference is vital."

The argument which the State makes in support of

the constitutionality of this statute is that the business of selling milk to dealers must be done on credit; that there are many milk dealers who are irresponsible; that many producing dairymen have been and will be forced out of business because they cannot collect their bills; and that therefore the Act is a proper measure for the preservation of the milk supply. The facts on which the State relies are not of record and we cannot take judicial notice of them. The statute is unexplained save by its own terms, and it gives no reason for prohibiting all persons from purchasing milk from producing dairymen except such as are able, in one of two alternative ways, to satisfy the food and dairy commissioner of their financial responsibility.

We have another statute (§ 3942) which forbids persons other than corporations organized for that purpose, from doing business as bankers until they have given bonds in a sum fixed by the statute for the protection of their customers. A similar statute of New York has been upheld by the Supreme Court in *Engel* v. *O'Malley,* 219 U. S. 128, 31 Sup. Ct. 190, and the argument leading to the justification of the Act is summed up on pages 136, 137, as follows: "The *quasi*-paternal relations shown in argument and by documents to exist between those following the plaintiff's calling and newly-arrived immigrants, justifies a supervision more paternal than is needed in ordinary affairs." That language is not applicable to this case. And it is also true that the banking business is not one in which any citizen has an unqualified right to engage. In that respect it differs from the business of purchasing milk from producing dairymen, which appears on its face to be a business in which all citizens have a right and an equal right to engage. For both of these reasons § 3942 stands on a different footing from the statute under investigation. What is a reasonable require-

ment for the protection of the public in the one case, may be quite unreasonable and oppressive in the other.

Occupations which, because of their nature or of the manner in which they are carried on, afford to the unscrupulous peculiar opportunities for defrauding the public, may be regulated according to the necessities of each case. Thus employment agencies may be strictly regulated, on the ground that they deal with a relatively helpless class of customers. Brazee v. Michigan, 241 U. S. 340, 343, 36 Sup. Ct. 561; Adams v. Tanner, 244 U. S. 590, 37 Sup. Ct. 662. And on the same general theory that the public bargains at a disadvantage with those who carry them on, other occupations or modes of conducting business are subjected to police regulations more or less stringent. For example, emigrant agencies (Williams v. Fears, 179 U. S. 270, 21 Sup. Ct. 128); makers of package goods (Armour & Co. v. North Dakota, 240 U. S. 510, 36 Sup. Ct. 440); dealers in securities (Hall v. Geiger-Jones Co., The Blue Sky Cases, 242 U. S. 539, 37 Sup. Ct. 217); retailers offering trading stamps (Rast v. Van Deman & Lewis, 240 U. S. 342, 36 Sup. Ct. 370); itinerant vendors (State v. Feingold, 77 Conn. 326, 59 Atl. 211); cooperative dairies (Hawthorn v. The People, 109 Ill. 302); sales in bulk (Lemieux v. Young, 211 U. S. 489, 29 Sup. Ct. 174).

In all these cases the regulation must not be unreasonably in excess of what is necessary to accomplish the supposed end; and in the case of a business in which all citizens have a right and an equal right to engage, the principle of equality of rights must, in this State, be observed.

In applying these general principles to the statute under investigation, it may be said at the outset that no reason appears why producing dairymen should not be able to deal with buyers of milk on equal terms. They

The State *v*. Porter.

ought to be qualified to sell milk, for this is their chosen business. As the New York Court of Appeals said of an almost identical statute: "This statute points to protection from the probability of financial loss rather than fraud, and goes far beyond any mere licensing statute by requiring the licensee to give security for payment of his debts to purchasers. The business regulated is not done with ignorant people, the chosen and easy prey of the cunning and unscrupulous imposter. It is done with men of ordinary intelligence, fully conscious of what they are about." *People* v. *Beakes Dairy Co.*, 222 N. Y. 416, 428, 119 N. E. 115.

Even if it be true that producing dairymen are in the habit of giving credit to irresponsible milk peddlers, we do not think the situation disclosed by this record calls for the exercise of the police power to the extent of forbidding any person to go into the business of buying milk from them unless he can satisfy the dairy commissioner of his financial responsibility. As already intimated, the business of buying milk to be resold is a business in which all citizens have a right and an equal right to engage, subject to reasonable regulations for the protection of public health; and the regulations in question have nothing to do with the public health. This statute simply makes it unlawful for milk dealers to purchase milk from a particular class of persons, without a certificate of financial responsibility from the dairy commissioner. Any milk dealer may buy his milk from a middleman, but he cannot buy it from a producing dairyman, though the seller be willing to sell and the buyer be willing to buy, without a license which is in fact a certificate that the dairy commissioner is satisfied that he is of sufficient financial responsibility to be allowed to contract with producing dairymen. This we think is an unnecessarily oppressive restriction on the right of contract.

The statute fixes no condition upon compliance with which any person may become entitled as of right to a license to contract with producing dairymen in the purchase of milk. There is nothing in the Act which requires the dairy commissioner to issue a license on proof of financial responsibility or tender of a sufficient bond; and since the business is one in which all citizens have a right and an equal right to engage, the principle of equality of right is violated within the rule laid down in *State* v. *Conlon*, 65 Conn. 478, 33 Atl. 519.

Again, § 2 contemplates that upon a breach of the condition of the bond it may be forfeited, and that the avails thereof are to be turned over to the dairy commissioner, who is to hear and determine the claims of producing dairymen against the defaulting licensee, and to satisfy them pro rata. Since no appeal to any court is provided for, this part of the statute is manifestly unconstitutional because it attempts to confer judicial powers on the commissioner, and because it attempts to turn over the licensee's property to his alleged creditors without opportunity for a day in court. For the reasons above indicated, we hold that the statute is unconstitutional.

There is no error.

In this opinion the other judges concurred.