175 So. 453

**STATE v. CHISESI.**

**SAME v. RAPHAEL et al.**

Nos. 34279, 34281.

May 24, 1937.

Robert A. Ainsworth, Jr., of New Orleans, for appellants.

Gaston L. Porterie, Atty. Gen., James O'-Connor, Asst. Atty. Gen., Charles A. Byrne, Dist. Atty., and Chandler C. Luzenberg, Jr., and Sidney A. Mitchell, Asst. Dist. Attys., all of New Orleans, for the State.

O'NIELL, Chief Justice.

Although these cases were tried separately in the criminal district court, they may be considered as one case because the same question is presented in both cases. The question is whether the statute which the defendants stand convicted of violating contravenes the Fourteenth Amendment, and particularly the equal protection clause in the Fourteenth Amendment, of the Constitution of the United States. The statute, which is Act No. 237 of 1932, p. 743, as amended by Act No. 176 of 1934, p. 554, requires that every dealer in farm produce shall, before engaging in the business, obtain a special license from the commissioner of agriculture and immigration. And the statute declares that any one who violates any of its provisions shall be guilty of a misdemeanor, and on conviction shall be fined or imprisoned, or be fined and imprisoned, within certain limits, at the discretion of the court. The charge in the bill of information against each defendant was that he "did wilfully and unlawfully engage in the business of a dealer in farm produce in the State of Louisiana without first obtaining from the Commissioner of Agriculture and Immigration a license to engage in such business." The defendants filed general demurrers, pleading that the statute was violative of the due process clause, and of the equal protection clause, in the Fourteenth Amendment, and violative of the commerce clause, in section 8 of article 1, of the Constitution of the United States, and violative of the due process clause in section 2 of article 1 of the Constitution of Louisiana. The demurrers were overruled. The defendants then pleaded not guilty, but urged no other defense than that the statute which they were accused of violating was unconstitutional. They were tried and convicted and each of them was sentenced to pay a fine of $50 or be imprisoned for six months. They are appealing from the conviction and sentence. Their right of appeal rests upon the fact that the constitutionality of a tax—the license tax—is contested. The Constitution, article 7, § 10, confers upon the Supreme Court appellate jurisdiction in all cases where the constitutionality or legality of a tax is contested.

The statute, according to its first section (Act No. 237 of 1932, § 1, as amended by Act No. 176 of 1934, § 2), is applicable only to wholesale dealers in farm produce. By the second section of the act (Act No. 237 of 1932) every person, firm, exchange, association, or corporation, intending to engage in the business of a dealer—meaning a wholesale dealer—in farm produce, is obliged, before engaging in the business, to obtain from the commissioner of agricul-

ture and immigration a license to engage in the business. The application for the license must be made on such blank form as shall be furnished by the commissioner, and shall set forth such facts pertaining to the applicant's business as the commissioner may require, besides a statement of the kind or kinds of farm produce to be handled, and the full name of the applicant, and of the members of the firm or corporation, if the applicant be a firm or corporation, and the street address at which the business is to be conducted. The application shall contain a statement, satisfactory to the commissioner, of the applicant's character, responsibility and good faith in seeking to carry on the business of a dealer in farm produce. The commissioner shall thereupon—that is, upon being satisfied of the applicant's character, responsibility and good faith in seeking to carry on the business of a dealer in farm produce,—and on receipt of a license fee of $10 and a bond for $2,000, as required by the third section of the act (Act No. 237 of 1932)—issue a license to the applicant to conduct the business of a dealer in farm produce.

The third section of the act requires every applicant for a license to give a bond for $2,000 to the commissioner, issued by a reputable surety company authorized and qualified to do business in Louisiana, to secure the honest conduct of the dealer's business, and to secure the payment of all money or accounts owed by the dealer in farm produce to any person, firm, exchange, corporation or association, arising out of the conduct of the business of the dealer in farm produce. The commissioner is authorized to institute suit on the bond, against the dealer and his surety, for the collection of any money or account that the dealer in farm produce may owe to any person, firm, exchange, corporation or association, arising out of the conduct of the business of the dealer in farm produce. The commissioner is obliged to proceed, within thirty days after collecting the amount of the bond, to distribute the money "among the bona fide creditors and claimants entitled thereto." If the amount of the bond is sufficient to pay all of the creditors or claimants in full, they shall be paid in full; otherwise each creditor or claimant shall receive his pro rata of the amount of the bond. It is said that the act shall apply to all claims unliquidated at the time of the act's going into effect.

By the fourth section of the act, the commissioner and his assistants are given authority to investigate, either on proper complaint or on their own initiative, the record of any applicant for a license to do business as a dealer in farm produce, and to investigate any transaction involving the solicitation, receipt, sale or attempted sale of farm produce, or any failure to make a prompt or true account or settlement, or the making of a false statement of the quality or quantity of goods received, or in storage, or a false statement as to market conditions, or a failure to make payment for goods received, or other injurious transaction; and the commissioner and his assistants are authorized to investigate any and all matters of any nature or kind whatsoever concerning the business or transactions of dealers in farm produce.

By the fifth section of the act, the commissioner of agriculture and immigration is

authorized to decline to grant a license, or to revoke a license already granted, whenever he is convinced that the applicant for a license, or the licensee, has been guilty of fraud, or bad faith, or a violation of any one or more of the provisions of the act. And in this section it is declared that the granting or revocation of licenses shall be left to the sound discretion of the commissioner. All that he is obliged to do, before revoking a license, is to give the licensee three full days' written notice of the time and place of a hearing to determine whether the license shall be revoked; and, at the hearing, the commissioner shall receive evidence, and hear the licensee, and shall thereafter file in his (the commissioner's) office an order either dismissing the proceeding or revoking the license. As amended by Act No. 176 of 1934 (section 3), this section of the act authorizes the commissioner to proceed by injunction, through the district attorney of any parish in which a violation of the act is alleged to have occurred, to restrain any dealer in farm produce from engaging in the business after his license has been revoked, or from engaging in the business without a license, or from engaging in the business after being convicted of operating without a license, or after being refused a license; or to restrain a dealer who has been convicted of a violation of the act from engaging in the business under a false name, or by subterfuge, or through a corporation of which he owns a majority of the stock. Under this section of the act, as amended, if the writ of injunction against the dealer in farm produce is perpetuated, he shall be condemned to pay not only the court costs but also the necessary cost of obtaining the evidence, and an attorney's fee to be paid to the district attorney for prosecuting the suit.

In the sixth section of the act, the license fee is fixed at $10 per annum, payable on the first day of the year. The money so collected by the commissioner is to be deposited with the fiscal agent of the Department of Agriculture and Immigration, and checked out by the commissioner, and used for carrying out the provisions of the act, and for establishing, increasing, stimulating and encouraging the markets for the farm products of the state.

The seventh section of the act prescribes the penalty for a violation of any of its provisions, and the eighth and last section is the repealing clause, repealing all laws or parts of laws in conflict with the provisions of the act.

The analysis which we have given of the statute discloses that it puts the business of wholesale dealing in farm produce absolutely under the control of the commissioner of agriculture and immigration. In fact, it is said in the second section of the act, and is repeated in the fifth section, that the matter of granting or withholding a license, or of revoking a license that has been granted, is left entirely to the sound discretion of the commissioner, and is dependent entirely upon his being satisfied with the character, responsibility, good faith and fair dealing of an applicant for a license, or a licensee, as the case may be, to carry on the business of a dealer in farm produce.

It is conceded, and is apparent, that that statute has no concern whatever with

the public health. If it had been enacted in the interest of the public health, the enforcement of the statute would have been intrusted to the State Board of Health. It is conceded that the defendants in these cases, and in fact all dealers in farm produce, are subjected to the rules and regulations of the State Board of Health, with regard to the inspection of the produce which they handle, and the payment of the inspection fees. It is conceded also—and the evidence is in the record—that these defendants have paid regularly every year the same occupational license tax that is paid by wholesale dealers in other merchandise, and that the volume of business done by these defendants is within the brackets which require a license tax of $50 per year, for carrying on their business as wholesale dealers in merchandise. They are wholesale dealers in poultry and eggs. One of them, Chisesi, buys his poultry and eggs in Mississippi and Texas, and the two others, Raphael Brothers, buy in Mississippi, Arkansas and Texas. It is because they did not buy any poultry or eggs or other farm produce in Louisiana that they invoked, as a defense, the commerce clause in the Constitution. But that is a matter of no importance, because the business is not interstate commerce. The poultry and eggs are bought and paid for outside of Louisiana, and the transactions, as far as the buying is concerned, are completed outside of the state. Thereafter, the poultry and eggs are transported into Louisiana and to New Orleans, in motortrucks, and are sold here, to retail dealers.

It is said that the purpose of the statute is to protect the farmers against fraud or imposition on the part of the wholesale dealers in farm produce. The statute serves no such purpose, as far as the business described in these cases goes, because, according to the custom of the trade, the defendants, and in fact all wholesale dealers in poultry and eggs, buy not from the farmers, but from middlemen, whose business is to buy from the farmers to sell to the wholesale dealers. All of this, however, only goes to show that there is no good reason why the wholesale dealers in farm produce should be centered out from among the wholesale dealers in merchandise generally, to be subjected to such burdensome regulation and discrimination as this statute imposes upon them. The conditions and obligations of the bond which the statute requires of a wholesale dealer in farm produce are such that it seems impossible that any one could furnish the bond except by putting up the amount in cash.

In the case of Allgeyer v. State of Louisiana, 165 U.S. 578, 589, 17 S.Ct. 427, 431, 41 L.Ed. 832, 835, the court, referring to the Fourteenth Amendment, said:

"The 'liberty' mentioned in that amendment means, not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling," etc.

In the course of the opinion in the case cited, the court quoted with approval from the opinion of Mr. Justice Bradley, in Butchers' Union S. H. & L. S. Co. v. Crescent City L. S. L. & S. H. Co., 111 U.S. 746,

765, 4 S.Ct. 652, 28 L.Ed. 585, 590, to the effect that to deprive a person of his right to pursue his chosen calling deprives him of his liberty, and to prevent his continuing in a lawful business or pursuit in which he is already engaged deprives him of his property, in the meaning of the Fourteenth Amendment. To the same effect see Lochner v. New York, 198 U.S. 45, 53–64, 25 S. Ct. 539, 49 L.Ed. 937, 940–944, 3 Ann.Cas. 1133.

■ The statute in question in this case, however, is so obviously violative of the equal protection clause in the Fourteenth Amendment that it is hardly necessary to consider the due process clause. The statute has two distinct features that contravene the equal protection clause. One of these objectionable features is that the discrimination against wholesale dealers in farm produce, as distinguished from wholesale dealers in all other classes of merchandise, is arbitrary, because it has no just or reasonable relation to the public welfare. The other objectionable feature of the statute is that the power which it invests in the commissioner of agriculture and immigration, to determine who may and who may not engage in the business of a wholesale dealer in farm produce, is an arbitrary power, because it is not controlled by any fixed rule or standard, but is left to the unrestricted judgment of the commissioner to say who is worthy and who is unworthy of the privilege of engaging in the business of a wholesale dealer in farm produce.

On the question of the arbitrary discrimination between the wholesale dealers in farm produce and the other wholesale deal-

ers, the ruling in Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 552, 22 S.Ct. 431, 438, 46 L.Ed. 679, 687, on the question of constitutionality of a statute of Illinois (Act June 20, 1893, Laws 1893, p. 182), is decisive. The statute forbade combinations in restraint of trade and was declared violative of the equal protection clause of the Fourteenth Amendment of the Constitution, because (in the ninth section of the statute [page 184]) it was provided: "The provisions of this act shall not apply to agricultural products or live stock while in the hands of the producer or raiser." The discrimination was in favor of the agriculturalists and livestock raisers. In deciding that the discrimination was arbitrary, the court said:

"Looking specially at its provisions, it will be seen that, so far as the statute is concerned, two or more agriculturalists or two or more live-stock raisers may, in respect of their products or live stock in hand, combine their capital, skill, or acts for the purpose of creating or carrying out restrictions in the sale of such products or live stock; or limiting, increasing, or reducing their price; or preventing competition in their sale or purchase; or fixing a standard or figure whereby the price thereof to the public may be controlled. * * * All this, so far as the statute is concerned, may be done by agriculturalists or live-stock raisers in Illinois without subjecting them to the fine imposed by the statute. But exactly the same things, if done by two or more persons, firms, corporations, or associations of persons who shall have combined their capital, skill, or acts, in respect of their property, merchandise, or commodities held for sale or

exchange, is made by the statute a public offense. * * * Is not this such discrimination against those engaged in business (other than the sale of agricultural products and live stock in the hands of producers and raisers) as is forbidden by that clause of the 14th Amendment which declares that 'no state shall * * * deny to any person within its jurisdiction the equal protection of the laws?' "

After citing Barbier v. Connolly, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923; Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, and Hayes v. Missouri, 120 U.S. 68, 7 S.Ct. 350, 30 L.Ed. 578, and referring to the principles there announced, the court proceeded, thus:

"These principles, applied to the case before us, condemn the statute of Illinois. We have seen that under that statute all except producers of agricultural commodities and raisers of live stock, who combine their capital, skill, or acts for any of the purposes named in the act, may be punished as criminals, while agriculturalists and live-stock raisers, in respect of their products or live stock in hand, are exempted from the operation of the statute, and may combine and do that which, if done by others, would be a crime against the state. The statute so provides notwithstanding persons engaged in trade or in the sale of merchandise and commodities, within the limits of a state, and agriculturalists and raisers of live stock, are all in the same general class, that is, they are all alike engaged in domestic trade, which is, of right open to all, subject to such regulations, applicable alike to all in like conditions, as the state may legally prescribe.

"The difficulty is not met by saying that, generally speaking, the state when enacting laws may, in its discretion, make a classification of persons, firms, corporations, and associations, in order to subserve public objects. For this court has held that classification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis.' * * *

"We therefore hold that the act of 1893 is repugnant to the Constitution of the United States, unless its 9th section can be eliminated, leaving the rest of the act in operation."

The court then observed that, if the ninth section of the act were eliminated, the effect would be to make the law applicable to agriculturalists and livestock raisers; to whom the Legislature had declared that the law should not be applicable. Hence the statute was adjudged entirely null.

This court has not had occasion heretofore to consider the question of constitutionality of such a statute as the one now under consideration; but in other jurisdictions the courts have held such statutes to be unconstitutional because of the arbitrary discrimination against a particular class of dealers. For example, this is from the syllabus of the decision in People ex rel. Valentine v. Berrien Circuit Judge, 124 Mich. 664, 83 N.W. 594, 50 L.R.A. 493, 83 Am.St.Rep. 352, by the Supreme Court of Michigan, in 1900, viz.:

"A law [Act No. 251 of the Public Acts of 1899] requiring merchants who sell farm

produce upon commission to execute a bond, in the penal sum of $5,000, conditioned for the faithful performance of their contracts, and to pay a license fee, is unconstitutional."

In deciding the case, the court said:

"Acts of this character, when valid, must find a reason for their existence in the police power of the state. The act is not aimed at brokers, in the ordinary meaning of that word. It is not aimed at commission merchants generally. It·is aimed solely at commission merchants who engage in the business of selling farm produce for producers upon commission. It provides that such a merchant shall pay a fee and execute a bond, as conditions precedent to doing business. The condition of the bond is the honest and faithful performance of his contracts. The business of buying and selling on commission has existed ever since commerce began. There are and .always have been dishonest men engaged in it, as there are and always have been in every other branch of business. There are and always have been dishonest sellers, who will pack their produce in such a manner as to deceive. It would be as reasonable to require the latter to give bond to properly pack their produce. In every such case the common law provides an ample remedy for redress to the injured party for breach of contract. There is no more reason why a commission merchant should pay a license fee, and execute a bond to pay his debts and to do his business honestly, than there is that any other merchant should pay a like fee, and file a like bond to properly do his business and pay his debts. The business requires no regulation, any more than any

other mercantile pursuit. There is nothing in it hostile to the comfort, health, morals, or even convenience, of a community."

The Supreme Judicial Court of Maine, in State v. Latham, 115 Me. 176, 98 A. 578, 579, L.R.A.1917A, 480, in 1916, held that a statute (Rev.St. c. 136, § 12) which required milk dealers to pay semimonthly for the milk or cream that they bought violated the equal protection clause in the Fourteenth Amendment, because the discrimination against such dealers was arbitrary. In deciding the case the court said:

"The statute in question, when analyzed, appears to be designed to compel purchasers of a particular product, intended for a particular use, to pay their purchase debts at particular times on pain of criminal prosecution, punishment by fine, and, of course, imprisonment for. 30 days, if the fine is not paid. * * *

"It gives the milk producer a strong club to aid in the collection of debts which is not given to other creditors. It subjects a class of debtors to liability of criminal prosecution to which other classes of debtors are not subjected. Such discrimination, unless based upon some real differences in condition, or situation, or necessities concerning the public health, welfare and so forth, offend against 'the equal protection of the laws' clause of the federal Constitution, and the statutes which .make them are invalid. * * * If the producer of milk can properly be aided in this way in the enforcement of his claims, why, with equal reason, may not the man who sells it to the consumer? Why may not grocerymen and dealers

in dry goods be given this aid in collecting their bills?"

The Supreme Court of Errors, in Connecticut, in State v. Porter, 94 Conn. 639, 110 A. 59, 61, in 1920, decided that a statute (Pub. Acts 1919, c. 194, §§ 2, 3) which required retail milk dealers, in order to buy from dairymen, to procure a license, to be issued only upon the applicant's furnishing to the dairy commissioner proof of applicant's financial responsibility to pay his debts to the dairymen, or upon his furnishing a bond conditioned upon the payment of such debts, was "an unnecessarily oppressive restriction on the right of contract." In deciding the case the court said:

"Even if it be true that producing dairymen are in the habit of giving credit to irresponsible milk peddlers, we do not think the situation disclosed by this record calls for the exercise of the police power to the extent of forbidding any person to go into the business of buying milk from them, unless he can satisfy the dairy commissioner of his financial responsibility. As already intimated, the business of buying milk to be resold is a business in which all citizens have a right, and an equal right, to engage, subject to reasonable regulations for the protection of public health; and the regulations in question have nothing to do with the public health. This statute simply makes it unlawful for milk dealers to purchase milk from a particular class of persons, without a certificate of financial responsibility from the dairy commissioner. Any milk dealer may buy his milk from a middleman, but he cannot buy it from a producing dairyman though the seller be willing to sell and the buyer be willing to buy, without a license which is in fact a certificate that the dairy commissioner is satisfied that he is of sufficient financial responsibility to be allowed to contract with producing dairymen. This we think is an unnecessarily oppressive restriction on the right of contract."

Again, in 1935, the Supreme Judicial Court of Maine, in State v. Old Tavern Farm, 133 Me. 468, 180 A. 473, 476, 101 A. L.R. 810, held that a statute requiring the operators of milk gathering stations, as a condition to obtaining a license, to give bond to secure payment for the purchases of milk and cream, was unconstitutional. The court said:

"The proprietary plan of dealing in and with dairy products is much like any other business. The proprietor buys, is liable for purchases, and assumes risks and profits. There are, as is true of many concerns, some which result in failure. Injudicious locations, excessive capitalizations, have contributed, now and again, to brief careers. Mismanagement, fires, rivalry, add to the causes. Businesses come and go, and losses are inevitable. A business is without constitutional protection against the hazards of competition. Hegeman Farms Corporation v. Baldwin, 293 U.S. 163, 55 S.Ct. 7, 79 L. Ed. 259. * * *"

"The rights of every person must stand or fall by the same rule of law that govern every other member of the body politic under similar circumstances, and every partial or private law which directly proposes to destroy or modify personal rights, or does the same thing by restricting the privileges of certain classes, and not of others, where

there is no public necessity therefor, is unconstitutional and void."

 Adverting to the other reason why the statute in question constitutes a denial of the equal protection of the laws, we find the books full of decisions to the effect that **a** state statute or municipal ordinance which undertakes to regulate a lawful business or occupation by conferring upon a designated officer, or commission, or board, the authority, within his or its judgment or discretion, to grant or to withhold a license or permit to engage in the business or occupation, and which does not prescribe a rule or standard to which all persons similarly situated may conform, constitutes a denial of the equal protection of the laws. The leading case on the subject, of course, is Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L. Ed. 220. The Louisiana cases maintaining the principle are: State v. Mahner (1891) 43 La.Ann. 496, 9 So. 480; State v. Dubarry (1892) 44 La.Ann. 1117, 11 So. 718; State v. Kuntz (1895) 47 La.Ann. 106, 16 So. 651; City of New Orleans v. Palmisano (1920) 146 La. 518, 83 So. 789; City of Shreveport v. Herndon (1925) 159 La. 113, 105 So. 244; State v. Carter (1925) 159 La. 121, 105 So. 247; State ex rel. Dickson **v.** Harrison (1926) 161 La. 218, 108 So. 421, and Bultman Mortuary Service Inc. v. City of New Orleans (1932) 174 La. 360, 140 So. 503.

The convictions and sentences appealed from are annulled and set aside; the statute under which the defendants were prosecuted, Act No. 237 of 1932, as amended by Act No. 176 of 1934, is adjudged unconstitutional; and the prosecutions are dismissed.