STATE OF CONNECTICUT *v.* JOHN SZYMANSKI

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. CR 15-1817

Argued June 21—decided November 13, 1962

*William J. Butler,* of Hartford, for the appellant (defendant).

*James R. Burton,* assistant prosecuting attorney, for the appellee (state).

PRUYN, J. The defendant was convicted in a trial to the court of violating the zoning ordinance of the

city of New Britain in respect to the number of motor vehicles on one lot and of operating a motor vehicle junk yard contrary to the restrictions contained in this ordinance, in violation of § 21-26 of the General Statutes. He has assigned error in the refusal of the court to make requested corrections in the finding, in the conclusions of the court as not being supported by the subordinate facts, in the rendition of the judgment in that it was not supported by the conclusions reached by the court, and lastly in the conclusion of the court on all the evidence that the defendant was guilty of the crimes charged beyond a reasonable doubt. In view of this last assignment, we need not consider in detail the claims of error in respect to the finding, for we determine from the entire evidence whether the court's conclusion of guilt was correct. *State* v. *Pundy,* 147 Conn. 7, 8. We have given consideration to the finding only as it shows, where there is conflicting evidence, the conclusion the court reached on it. *State* v. *Dziob,* 133 Conn. 167, 168.

The defendant is the owner of premises known as 269 Oak Street, New Britain, comprising lot 11, fronting on Oak Street, and lot 17, facing Dudley Street, a parallel street. The lots have a common boundary; each has a frontage of 50 feet and, taken together, they have a depth of about 255 feet between the two streets. For many years prior to September 16, 1925, and until he sold the premises to the defendant in 1952, Jacob Flemke operated a used-car business and repair garage on these lots. On September 16, 1925, the New Britain zoning ordinance was adopted, and these premises were placed in a residence C zone. Prior to September 16, 1925, and until it was destroyed by fire in 1951, a wooden garage structure stood on the premises, fronting on Oak Street. On February 23, 1951, the common council of New Britain, on recommendation

of the board of adjustment of the city, granted Flemke an exception to permit him to construct a cinder-block, steel and frame garage to replace the frame structure, to be located partly on the Oak Street lot but extending over three feet onto the Dudley Street lot. The building faces on Oak Street and has a garage door on the Dudley Street side. The zoning ordinance permitted, in a residence C district, not more than seven motor vehicles on any one lot within twelve feet of any party lot line. In November, 1961, and continuing up to the start of the trial, both the Oak Street and the Dudley Street lots were filled with more than seven motor vehicles in all conditions of repair and disrepair. The building inspector in December, 1961, inspected the premises and thereafter ordered the defendant to remove from the Dudley Street lot all motor vehicles in excess of seven.

As to the use of the Dudley Street lot for the parking of cars prior to the enactment of the zoning ordinance, the evidence was conflicting and somewhat vague, but the court could have reasonably found, as it did, that fewer than seven cars were parked thereon. There is no question that, since the premises were used prior to the enactment of the zoning ordinance for a used-car and repair business, their present use in such a business is a nonconforming use. The sole question on the first count is whether the increased use of the Dudley Street lot is violative of the zoning ordinance.

Nonconforming uses are exceptions to the general principle of zoning that certain uses should be confined to certain localities, and it is the policy of the law not to extend them but to reduce them to conformity as completely and as speedily as possible with due regard to the interest of the parties. *Salerni* v. *Scheuy,* 140 Conn. 566, 570; *Thayer* v. *Board of Appeals,* 114 Conn. 15, 23. But this prin-

ciple does not apply to an increase in the amount of use; the use may be increased in extent by natural expansion and growth. *Salerni* v. *Scheuy,* supra, 571; *Guilford* v. *Landon,* 146 Conn. 178, 182; *Nyburg* v. *Solmson,* 205 Md. 150, 161; *Humphreys* v. *Stuart Realty Corporation,* 364 Pa. 616, 621. "Once it . . . [has been] determined . . . that a nonconforming use existed, natural development and growth cannot be paralyzed by an overly-technical appraisement of the existing use. An ordinance which would allow the housing of a baby elephant cannot evict the animal when it has grown up . . . . If we were to prevent the natural growth and expansion of a protected nonconforming use, we would invade the constitutional guarantees of due process which indeed brought the nonconforming principle into being." *Upper Darby Township Appeal,* 391 Pa. 347, 353. "Ordinarily businesses either grow or shrivel up. They seldom stand still." *McMahon* v. *Board of Zoning Appeals,* 140 Conn. 433, 441. Nor is it necessary that the nonconforming use as it existed at the time the zoning ordinance was adopted should have covered the entire tract, in order that the owner could subsequently use it all. *DeFelice* v. *Zoning Board of Appeals,* 130 Conn. 156, 161; *Nyburg* v. *Solmson,* supra. In the *Nyburg* case, the restriction imposed by the zoning board that no more than ten cars could be parked on the lot in front of the garage building, since that was the extent of the use at the time of the adoption of the zoning ordinance, was stricken down because an increase in the number of cars parked was "not an extension but merely an intensification of a long continued non-conforming use."

From the entire evidence, including the exhibits, it is clear to us that the increased use of the Dudley Street lot for the parking of cars was not an extension of the defendant's used-car and repair business

but was an intensification of that nonconforming use and as such was not violative of the New Britain zoning ordinance.

Motor vehicle junk yards are subject to strict regulation and licensing under the provisions of chapter 406 of the General Statutes. A municipality may create restricted districts within which motor vehicle junk yards may not be permitted. § 21-23. A certificate of approval of the location for the establishment, operation or maintenance of such junk yards must be obtained from the zoning board of appeals of the municipality; § 21-16; and thereafter a license therefor must be issued by the commissioner of motor vehicles. § 21-18. Section 21-15 defines a motor vehicle junk yard as "any business and any place of storage or deposit, whether in connection with another business or not, which has stored or deposited two or more unregistered motor vehicles which are no longer intended or in condition for legal use on the public highways, or used parts of motor vehicles . . . , the sum of which parts . . . shall be equal in bulk to two or more motor vehicles."

The defendant was licensed by the commissioner of motor vehicles to operate a used car and repair business on the premises involved in the instant case. In that business, he accepted used cars as trade-ins on purchases of other used cars. Also, cars which had been in accidents were brought in for repairs. Some of these latter cars had remained on the premises, including the Dudley Street lot, for two or three years pending the disposition of accident claims. Some of the cars parked on the Dudley Street lot had no registration plates on them, and some were in no condition to be operated on the highway. The defendant did not buy cars for junk or cut up cars for junk. He did remove

bumpers from cars and had a pile of them which he kept to be traded in for replacements of new bumpers, and likewise he had a few fenders. When he had enough fenders and wrecks for a load, he had the junkman take them away or took them away himself; this occurred about two or three times a year. Some two and one-half years prior to November, 1961, a senior motor vehicle inspector of the state of Connecticut in the regular course of his duties inspected the premises. He testified that he saw some fifteen cars on the Dudley Street lot, some of them in no condition for legal use on highways, and also saw some bumpers and tires on the premises; that he found no evidence that cars were cut up or parts removed therefrom for use on other cars; that he checked the condition of the cars; that some of the cars had no registration plates on them; that in his opinion the cars were not junks nor the premises a junk yard; and that he so reported to the motor vehicle department. The business of the defendant, its nature and extent, and the use of the premises were substantially the same in November, 1961, as at the time of this inspection.

The regulation of motor vehicle junk yards is a constitutional exercise of the police power of the state in the interest of public health, safety and welfare. *State* v. *Kievman,* 116 Conn. 458, 463. In that case, the defendant bought worn-out and broken automobiles, dismantled them, resold some of the parts and broke up others, using gasoline and acetylene gas in the process. The regulation of a business must not be unreasonably in excess of what is necessary to accomplish the purpose in view. *State* v. *Porter,* 94 Conn. 639, 645. The licensing of junk dealers is for the purpose of protecting the public against the crime of larceny and of providing for the detection of stolen articles. *Clapp* v. *Ulbrich,* 140 Conn. 637, 641.

The defendant was lawfully engaged in the business of repairing and selling used cars, and in the course thereof he naturally had on his premises many used cars in various degrees of repair or disrepair. Although a strict interpretation of the statute might lead to the conclusion reached by the trial court, it is clear to us that it was not the intention of the legislature to penalize the operation of a business such as that of the defendant. He did not cut up or buy cars for junk and did not dismantle them and use the parts in other cars, but did cause to be removed unrepairable cars and fenders when a sufficient number had accumulated for a load. The opinion of the motor vehicle inspector that the defendant was not operating a motor vehicle junk yard is entitled to great weight in interpreting the statute. *Leach* v. *Florkosky*, 145 Conn. 490, 495, and cases cited. "The purpose of the statute here, as stated heretofore, is to regulate motor vehicle junk businesses and motor vehicle junk yards because of their characteristics, to assure that they will be conducted in a legitimate manner. . . . 'Strict adherence to the letter of the . . . statute might seem to require the . . . conclusion [reached], but among recognized aids to be invoked in statutory construction are the legislative antecedents of the statute, and its practical construction, especially by a governmental agency charged with its administration. . . . The search is for the intent of the lawmakers and when it is clearly ascertainable it prevails over the literal sense and precise letter of the statute.' *State ex rel. Gray* v. *Quintilian*, . . . [121 Conn. 300, 304]. The only admissible interpretation of the definition . . . is that it is intended to embrace businesses having the characteristics of a motor vehicle junk business or motor vehicle junk yard." *Leach* v. *Florkosky*, supra, 496. On the facts of this case, the statute is not applicable.

We take note that the state did not file a brief in this case. We do not therefore have the benefit of a detailed statement of the arguments and points of law in support of its position. There having been no reporter on the argument of the appeal, our notes of the appellee's argument are of necessity brief and incomplete. "As far as the claims of counsel on one side or the other and the arguments which they advance in support of those claims are concerned, the printed briefs are largely the basis upon which the judge works." Maltbie, Conn. App. Proc. § 327. Where the appellant has failed to file his brief on time, the appeal has been dismissed. *Schuhmacher* v. *Peck,* 139 Conn. 426, 428. Circuit Court Rule 7.45.1 provides for the filing of briefs within two weeks after the filing of the assignment of errors, and Rule 7.7.1 provides a method for extension of the time of filing. In our experience, these rules have been more often than not honored in their breach. We also call attention to Circuit Court Rule 7.47.3, effective October 15, 1962, which provides that no claim of error not presented in a written brief duly filed need be considered.

There is error, the judgment is set aside and the case is remanded with direction to render judgment that the defendant is not guilty and ordering that he be discharged.

In this opinion DEARINGTON and KINMONTH, Js., concurred.